# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-358 (CRC)** |
| **v.** | : | |
| | : | |
| **PAUL BRINSON,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Paul Brinson has pleaded guilty to two offenses, disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol, in violation of 40 U.S.C. § 5104(e)(2)(D), and parading, demonstrating, or picketing in any Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G). For the reasons set forth herein, the government requests that this Court sentence Brinson to 60 days' incarceration on Count Three and 36 months' probation on Count Four. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

## I.     Introduction

Defendant Paul Brinson, a 66-year-old IT professional, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States

Brinson pleaded guilty to violations of 40 U.S.C. §§ 5104(e)(2)(D) and (G). The government's recommendation is supported by the facts that the defendant: (1) used a bicycle rack as a ladder to get closer to the Capitol Building; (2) witnessed other rioters break windows to gain entry to the Capitol; (3) breached into the Capitol through the Senate Wing Door less than three minutes after other rioters broke down windows and a door at that location, (4) stood near the front of a group of rioters that overran a line of officers inside the Capitol; (5) remained inside the Capitol building for approximately 39 minutes and ignored a clear opportunity to leave the building after seeing the early chaos; (6) joined a group of rioters who attempted to approach lawmakers evacuating from the House chamber; (7) after exiting the Capitol, remained on Capitol grounds for over an hour despite witnessing the shooting of a rioter inside the building; and (8) initially lied to the FBI about his actions during the riot and minimized his conduct.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Brinson's crime support a sentence of 60 days' incarceration, 36 months' probation, and 60 hours' community service in this case.

---

Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.      Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense, ECF No. 24.

*Defendant Brinson's Role in the January 6, 2021 Attack on the Capitol*

Brinson traveled to Washington, D.C. from Texas on January 5, 2021 in order to attend the "Stop the Steal" rally the following day. On January 6, 2021, Brinson attended the rally and then marched to the United States Capitol building with a large crowd of people. Once on Capitol grounds, he proceeded up the Northwest Scaffold Stairs with the first wave of rioters to breach this location. To aid this advancement, Brinson used a bicycle rack as a ladder. At the time, Brinson carried two flagpoles, each with a flag attached. *See* Image 1.



*Image 1: Brinson ascending the NW Scaffold Stairs*

Once on the Upper West Terrace, Brinson proceeded towards the Senate Wing Door. There, at 2:13 p.m., a number of rioters broke two windows, causing the first breach of the Capitol building. Once inside, rioters kicked down the Senate Wing Door itself, which allowed other rioters to flood into the building. Brinson joined this wave and walked through the broken-down doorway at 2:16 p.m. while still carrying the flags. *See* Image 2.



*Image 2: Brinson (circled in red) breaching into the U.S. Capitol*

Once inside, Brinson walked into the Crypt where a large crowd of rioters gathered before a line of police officers who were attempting to prevent the rioters' movement through the Capitol. *See* Image 3. At approximately 2:24 p.m., Brinson moved towards the east side of the Crypt as a group of rioters broke through the police line, forcing the officers to retreat. At the time of this effort, Brinson stood mere feet behind the front of the rioters, compounding the mass of people able to overrun the officers. *See* Image 4. Once the police line broke, Brinson continued onto the House side of the Capitol.



*Image 3: Brinson (circled in red) amongst the mob of rioters in the Crypt*



*Image 4: Brinson (circled in red) moving forward with the group of rioters who overran officers (circled in blue) in the Crypt*

By 2:34 p.m., Brinson moved upstairs into Statuary Hall and then joined another large group of rioters gathered at the last set of doors leading to the House chamber. *See* Image 5. These doors were barricaded and guarded by armed police officers. Several minutes later, Brinson moved

east down the connecting hallway. At 2:42 p.m., Brinson walked by, but did not use, the East Front

House Door exit. *See* Image 6.



*Image 5: Brinson (circled in red) approaching the outside of the House chamber, which is guarded by a line of officers standing at the bottom of the frame*



*Image 6: Brinson (circled in red) walking past an exit from the Capitol located to his left*

Rather than leaving the building, Brinson continued walking with other rioters and stopped

in front of a set of locked doors with glass panels. Behind those doors was a small group of police

officers with their firearms drawn who were protecting a group of congressional members

evacuating from the House chamber. Nonetheless, the rioters continued to press forward and broke

one of the glass panels. When one of the rioters tried to climb through the door frame, an officer

was forced to discharge his firearm, striking the rioter in the chest. When the shooting happened, Brinson was again mere feet away. *See* Image 7. After the shooting, despite carrying his flagpoles through most of the Capitol, Brinson lost them as he moved towards the exit.



*Image 7: Brinson (circled in red) standing just behind the doors as the rioter (circled in green) is shot*

Brinson exited the Capitol through the East Front House Door at 2:55 p.m., 39 minutes after entering. However, despite witnessing the shooting and the other instances of chaos within the Capitol, Brinson remaining on Capitol grounds until at least 4:09 p.m. *See* Image 8.



Figure 8: Brinson remaining on Capitol grounds as of 4:09 p.m. on January 6

*Brinson's Interview with the FBI*

On October 19, 2021, Brinson participated in an interview with the FBI at his home. In this interview, Brinson said that he went to Washington, DC because he believed that the 2020 presidential election was "illegitimate," and that former President Trump should have been the elected winner. Brinson also alleged that the riot was instigated by the FBI and that police officers setup a trap for rioters by letting them into the building. When the conversation turned to his role on January 6, Brinson initially lied and said that he did not enter the building. However, Brinson corrected himself and described his movements within the Capitol consistent with security footage. Brinson mentioned watching rioters breach through the line of police officers in the Crypt, but he failed to say that he was only a few feet away from where the breach occurred. Rather, Brinson discussed the scene as if he was a passive observer from afar.

While outside of the Capitol, he admitted to seeing barriers and police officers use chemical irritant against rioters. He admitted to using a bicycle rack as a ladder before he ascended to the Upper West Terrace. He also saw rioters break windows while breaching the building. Finally, Brinson admitted that, once inside, he saw rioters assaulting police officers who were guarding certain areas of the Capitol.

*The Charges and Plea Agreement*

On October 11, 2023, Brinson was charged in a four-count Information with entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); disorderly conduct in a Capitol building or grounds, in violation of 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, and picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G). On June 24, 2024, pursuant to a plea agreement, Brinson pleaded guilty to Counts

8

Three and Four of the Information, charging him with violations of 40 U.S.C. § 5104(e)(2)(D) and (G). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Brinson now faces a sentencing for violating 40 U.S.C. § 5104(e)(2)(D) and (G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As these offenses are Class B Misdemeanors, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 60 days' incarceration, 36 months' probation, and 60 hours' community service.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Brinson's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Brinson, the

absence of assaultive acts is not a mitigating factor. Had Brinson engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Brinson's case is just how many signs Brinson ignored before entering the Capitol and while inside, all of which indicated that the Capitol was not a lawful place to be. These signs included: (i) the swarm of rioters he marched with up to the Upper West Terrace; (ii) the fact that he had to use a bicycle rack as a makeshift ladder to progress towards the Capitol; (iii) rioters breaking windows as a means to breach the Capitol building; (iv) rioters over running police lines; and (v) the shooting of one of the rioters. Yet, for some reason, none of what he saw that day seemed to give Brinson pause. The shooting itself should have convinced him to leave the Capitol grounds altogether, but still he remained nearby for over an hour afterwards.

In addition, Brinson was a frontline rioter. Brinson was part of the first group of rioters that breached the Capitol via the Senate Wing Door, which precipitated all other breaches of the building. Brinson was also part of the mass of people that, as a group, overran the police officers stationed in the Crypt. Once further inside the building, Brinson joined a group of rioters who were trying to breach into the House chamber. They were only stopped by a barricade made of furniture constructed by police officers inside the chamber, who then drew their firearms and aimed them at the rioters to deter any breach. Then Brinson joined yet another group of rioters who tried to confront congressional members who were evacuating from the House chamber. While Brinson himself did not commit any direct acts of violence, his presence at significant points throughout the day meant that he was yet another rioter that police officers had to deal with while trying to secure the building.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 60 days' incarceration, 36 months' probation, and 60 hours' community service in this matter.

### B.  Brinson's History and Characteristics

As set forth in the PSR, Brinson has no criminal history other than a 1993 conviction for a Driving under the Influence offense. PSR ¶ 33. Brinson appears to have strong relationships with all members of his family. PSR ¶¶ 38-48. However, Brinson's teenage son, Stephen Paul Brinson, was separately charged for and convicted of conspiracy to possess with the intent to distribute fentanyl. *United States v. Stephen Paul Brinson*, 3:23-cr-67-K, ECF Nos. 51, 52 (N.D. Tex. Apr. 10, 2023). Stephen Brinson conducted his portion of the conspiracy from inside his father's home, distributing "approximately 1200 counterfeit pills containing a fentanyl powder mix to customers." 3:23-cr-67-K, ECF No. 51 at 2. Upon his arrest, the FBI conducted a search of Brinson's home for evidence of his son's conspiracy, during which agents located approximately 1,800 counterfeit pills, other controlled substances, drug distribution materials, and two firearms. *Id.* at 3. Stephen Brinson was sentenced to 100 months' incarceration for his actions. 3:23-cr-67-K, ECF No. 160. To be clear, Brinson's son – not Brinson himself – was held accountable for his role in narcotics trafficking. But any attempt to use his family as a mitigating factor at sentencing rings hollow. The reality is the defendant served as no meaningful role model in light of his conduct.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a

11

political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a term of incarceration.

Brinson did not accept the results of the 2020 presidential election, and on January 6, he was determined to make that opinion known. He added his weight to the mob on multiple

occasions, breaching the northwest scaffold stairs, Senate Wing Door, Crypt, and ultimately the hallway behind the House Chamber through which House members were evacuating. Brinson obviously knew that he was breaking the law because he used a bicycle rack, which had been a police barrier, as a makeshift ladder to ascend to the Upper West Terrace. He saw rioters use violence to breach police lines at several of the points listed above, and yet he continued pushing forward with the mob. Even after witnessing a USCP officer shoot a breaching rioter from mere yards away, Brinson remained in and around the Capitol for over an hour. Brinson's determination to remain near the front of the rioters wherever he went gave oxygen to the fire that was the mob, which necessitates specific deterrence for him.

Then, after January 6, during his interview with the FBI he minimized his role during the riot and pushed conspiracy theories that the rioters were entrapped by law enforcement to overtake the Capitol. This failure to acknowledge his own part in the riot and the motivations behind those who participated in it show not only a lack of remorse for his actions, but also an inability to see that what he did that day was unlawful. This conclusion is supported by the fact that it took Brinson nearly six months to accept the plea offer in this case, an acceptance that came only weeks before trial was scheduled to begin. With the 2024 presidential election approaching and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms ominously. The Court must sentence Brinson in a manner serious enough to deter him specifically, and others generally, from again attempting to disrupt democratic processes through mob violence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers.[2] This Court must sentence Brinson based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Brinson has pleaded guilty to Counts Three and Four of the Information, charging him with Disorderly Conduct in a Capitol Building and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. §§ 5104(e)(2)(D) and (G). These offenses are Class B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendation and sentence. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following case provides suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Cody Lee Tippett*, 23-cr-337 (CRC), Tippett joined the mob on the west front of the Capitol where he witnessed rioters commit acts of violence and police deploy riot control measures. After the west front fell, Tippett entered the Capitol through the Senate Wing Door six minutes after other rioters breached it. Tippett continued towards the Crypt and then onto

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

the Capitol Visitor Center ("CVC") after rioters broke through the police line. In the CVC, Tippett placed a piece of furniture under a security gate to prevent it from closing. After spending a few minutes in the CVC, Tippett returned to the Senate Wing Door and exited the building. Once outside, Tippett remained on Capitol grounds for nearly an hour. During his interview with the FBI, Tippett did not admit to some of the actions he took inside of the Capitol and pushed the theory that police officers had let rioters inside the building. Following his guilty plea to the same offenses at issue in this case, this Court sentenced Tippett to 30 days' incarceration and 36 months' probation.

While there are many similarities between Tippett's case and the facts at issue here, there are several differences that counsel a higher sentence for Brinson. Notably, Brinson put himself near the front of multiple separate groups of rioters that breached through police lines at critical locations in the Capitol. By adding to the mass behind these pushes, Brinson helped facilitate these breaches. Brinson also joined a group of rioters who were trying to confront congressional members as they evacuated the House chamber. Unlike Tippett, Brinson initially lied to the FBI when he told the agents that he didn't enter the Capitol. Lastly, Tippett accepted responsibility in his case far sooner than Brinson by entering into a plea agreement two weeks after it was offered compared to Brinson's six months. For these reasons, Brinson's conduct warrants a higher sentence than Tippett at 60 days' incarceration and 36 months' probation.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize

and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### V.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Brinson must pay $500 in restitution, which reflects in part

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

the role Brinson played in the riot on January 6.[4] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Brinson's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 100.

## VI.    Fine

The defendant's convictions for violations of 40 U.S.C. §§ 5104(e)(2)(D) and (G) subject him to a statutory maximum fine of $5,000 for Count 3 and $5,000 for Count 4. *See* 18 U.S.C. § 3571(b)(6). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine. PSR ¶ 80.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 60 days' incarceration, 36 months' probation, and 60 hours' community service. Such a sentence protects the community,

---

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

promotes respect for the law, and deters future crime by imposing restrictions on Brinson's liberty

as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

<div style="margin-left:40%;">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

</div>

By:    */s/ ANDREW HAAG*
Andrew Haag
Assistant United States Attorney
MA Bar No. 705425
601 D Street NW, Washington, DC 20530
Tel. No.: (202) 252-7755
Email: andrew.haag@usdoj.gov